UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

JAMES JACQUES,

   Plaintiff,

     v.

HIGH LINER FOODS USA, INC.,

   Defendant.

Civil Action No.

**COMPLAINT**
**JURY TRIAL REQUESTED**
**<u>INJUNCTIVE RELIEF REQUESTED</u>**

NOW COMES the Plaintiff, James Jacques, by and through undersigned counsel, and complains against the Defendant, High Liner Foods USA, Inc. ("Defendant" or "High Liner"), as follows:

<u>INTRODUCTION</u>

4. This action arises under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*, the New Hampshire Law Against Discrimination ("NHLAD"), RSA 354-A *et seq.*, and New Hampshire's common law protections against wrongful discharges in violation of public policy.

5. High Liner violated the ADA and the NHLAD by denying Mr. Jacques a reasonable accommodation; by discriminating against Mr. Jacques because he has a disability; and by retaliating against Mr. Jacques because he requested a reasonable accommodation and/or complained about High Liner's unlawful discrimination.

1

6. High Liner terminated Mr. Jacques because he has a disability, requested reasonable accommodations for his disability, and/or complained about unlawful discrimination. High Liner's termination of Mr. Jacques violated public policy and, as such, forms the basis for Mr. Jacques' common law claim for wrongful discharge.

## PARTIES

7. Mr. Jacques is a United States citizen residing in Berwick, Maine.

8. High Liner processes and markets frozen seafood throughout the United States. It has a facility in Portsmouth, New Hampshire, where Mr. Jacques worked.

## JURY TRIAL DEMAND

9. Plaintiff requests a trial by jury on all issues triable to a jury.

## JURISDICTION

10. High Liner had 500 or more employees for each working day in each of 20 or more calendar weeks in both 2018 and 2019.

11. The amount in controversy in this matter exceeds $75,000.

12. This Court has subject matter jurisdiction over Mr. Jacques' federal and state claims under 28 U.S.C. §§ 1331, 1332, and 1367.

43. On or about May 20, 2019, Mr. Jacques filed a timely Charge of Discrimination against High Liner with the Equal Employment Opportunity Commission ("EEOC") which was, by EEOC policy, dual filed with the New Hampshire Commission for Human Rights ("NHCHR").

44. On or about October 2, 2019, the EEOC issued a Notice of Right to Sue with respect to Mr. Jacques' federal law claims.

| 45. | Mr. Jacques has exhausted his administrative remedies with respect to all claims set forth in this Complaint. |

## FACTUAL ALLEGATIONS

| 46. | Mr. Jacques has diabetes with related neuropathy in his feet. |
| 47. | Mr. Jacques takes medications, regularly checks his blood sugar, and takes other actions to alleviate the symptoms of his diabetes and neuropathy. |
| 48. | Mr. Jacques has a disability as defined by the ADA and NHLAD. |
| 49. | At all relevant times, High Liner regarded Mr. Jacques as an individual with a disability under the ADA and NHLAD. |
| 50. | At all relevant times, Mr. Jacques had a record of a disability under the ADA and NHLAD. |
| 51. | High Liner hired Mr. Jacques in or around September 2011. |
| 52. | At all relevant times, Mr. Jacques worked in High Liner's Portsmouth, New Hampshire, warehouse as a Group Team Leader III. |
| 53. | On or about October 18, 2018, Mr. Jacques informed his supervisor, Warehouse Manager Tommy Glynn, that he was going to see a surgeon because he had diabetic neuropathy that caused pain in his feet and legs. |
| 54. | During this conversation, on or about October 18, 2018, Mr. Jacques asked Mr. Glynn if he could ask another Group Team Leader III, Daryl Joyce, to work more in the freezer because Mr. Jacques was doing more than his fair share of the freezer work. Mr. Jacques explained that the cold temperatures in the freezer caused him to suffer pain in his feet and legs due to his diabetic neuropathy. |

551. Mr. Jacques and Mr. Joyce worked together as a team to complete the freezer work but Mr. Joyce usually did not do his fair share of this teamwork.

561. In response to Mr. Jacques' request, on October 18, 2018, Mr. Glynn said he was the boss and he would decide how the freezer work would be divided.

571. On or about December 26, 2018, Mr. Jacques spoke to Mr. Glynn again about how working in the freezers in the warehouse was causing him pain in his feet and legs due to his diabetic neuropathy.

   a. Mr. Jacques told Mr. Glynn again that Mr. Joyce was not working in the freezers as much as Mr. Jacques. Consequently, Mr. Jacques was doing more than his fair share of the work in the freezers.

   b. Mr. Jacques informed Mr. Glynn that he would need to see a neurologist due to the pain in his feet and legs and that he did not need surgery.

   c. Mr. Jacques told Mr. Glynn that Mr. Joyce had time to do more work in the freezers, in part, because Mr. Joyce spent an excessive amount of time watching videos unrelated to work on the computer in the office.

   d. Mr. Jacques asked Mr. Glynn to instruct Mr. Joyce to do his fair share of work in the freezers because the cold temperatures were causing Mr. Jacques pain and if Mr. Joyce did more of the freezer work, Mr. Jacques would experience less pain.

581. As a result of Mr. Jacques' conversation with Mr. Glynn that occurred on or about December 26, 2018, Mr. Glynn directed Mr. Joyce to do his fair share of work in the freezer which meant that Mr. Jacques could work less in the freezer. However, this

division of the freezer work between Mr. Jacques and Mr. Joyce only lasted a few days and then Mr. Joyce went back to not working his fair share in the freezer.

59. On or about January 15, 2019, Mr. Jacques was working alone in the freezers for extended periods of time with little, if any, assistance from Mr. Joyce.

60. Because of the pain Mr. Jacques experienced on or about January 15, 2019, due to the lack of assistance from Mr. Joyce, Mr. Jacques texted Mr. Glynn to let him know that he was going home.

61. Mr. Glynn responded to Mr. Jacques' January 15, 2019, text message and then Mr. Jacques called him on the phone.

   a. During this phone call, Mr. Jacques told Mr. Glynn that he was going home because he was in pain due to the fact that he was being forced to do more than his fair share of the freezer work.

   b. Mr. Jacques told Mr. Glynn that both Mr. Joyce and another employee, Shane Sanford, were not working in the freezer and, instead, were on the computer.

   c. During this call, Mr. Glynn talked Mr. Jacques into returning to work.

62. On or about January 16, 2019, Mr. Jacques was called into a meeting with Human Resources Generalist Renate Guillemette and Mr. Glynn.

   a. During this meeting, Ms. Guillemette asked Mr. Jacques about his feet and diabetic neuropathy. She wanted to know if he could no longer work.

   b. Ms. Guillemette mentioned several times throughout the meeting that going in the freezer is part of Mr. Jacques' job and if he could not do that, it was going to be a problem.

5

c. Mr. Jacques said that he could work in the freezer. He said that he was in extreme pain the previous day but he returned to work after speaking with Mr. Glynn and was able to finish his shift.

d. Ms. Guillemette asked Mr. Jacques if he could get a note from his doctor about his diabetic neuropathy and he said that he could.

e. After the discussion about Mr. Jacques' diabetic neuropathy, Ms. Guillemette and Mr. Glynn informed Mr. Jacques that they had decided to suspend him without pay for using his work computer for personal reasons.

f. When Mr. Jacques heard the reason for the suspension he said "are you kidding me, Daryl uses the computer more than me." Ms. Guillemette responded to Mr. Jacques' statement by saying "we aren't talking about Daryl, we are talking about you."

631 By suspending Mr. Jacques allegedly for using his work computer for personal reasons, Ms. Guillemette and Mr. Glynn treated Mr. Jacques differently than similarly situated employees who did not have disabilities.

a. Even before the meeting on January 16, 2019, Mr. Jacques had informed Mr. Glynn that Mr. Joyce uses his computer to watch videos unrelated to work. Mr. Joyce was not disciplined for watching these videos.

b. Mr. Glynn also often showed Mr. Jacques YouTube videos on his work computer that were not related to work. Mr. Glynn was not disciplined for this.

c. Other non-disabled employees also used their work computers for personal reasons.

64. On or about January 17, 2019, the day after he was suspended, Ms. Guillemette terminated Mr. Jacques allegedly because of his personal use of his work computer.

65. Mr. Jacques had never been warned before his suspension and termination that he should not be using his work computer for personal reasons.

66. Defendant's Computing Technology policy states, in part, that employees may use "electronic equipment for incidental personal matters."

67. Given that other employees, including Mr. Glynn, used the internet for personal reasons, it was reasonable for Mr. Jacques to believe that he was permitted to do so as well.

68. Furthermore, based on the information that Defendant provided to the EEOC in response to Mr. Jacques' Charge of Discrimination, it appears as though when Defendant investigated Mr. Jacques' computer use, it did not also investigate Mr. Joyce's or other employees' computer use to determine if Mr. Jacques acted any differently from similarly situated individuals.

## COUNT I: ADA – Disability Discrimination

69. Paragraphs 1-35 are incorporated by reference.

70. Defendant's conduct violated the ADA's prohibition against disability discrimination.

71. Defendant discriminated against Mr. Jacques because of his disability, because it regarded him as disabled, and/or because he had a record of a disability.

72. Defendant discriminated against Mr. Jacques by requiring him to do more work than Mr. Joyce in the freezers.

73. Defendant discriminated against Mr. Jacques when it suspended him.

74. Defendant discriminated against Mr. Jacques when it terminated him.

75. Defendant's claim that it terminated Mr. Jacques due to his personal use of his work computer was a pretext for discrimination.

## COUNT II: NHLAD – Disability Discrimination

76. Paragraphs 1-42 are incorporated by reference.

77. Defendant's conduct violated the NHLAD's prohibition against disability discrimination.

78. Defendant discriminated against Mr. Jacques because of his disability, because it regarded him as disabled, and/or because he had a record of a disability.

79. Defendant discriminated against Mr. Jacques by requiring him to do more work than Mr. Joyce in the freezers.

80. Defendant discriminated against Mr. Jacques when it suspended him.

81. Defendant discriminated against Mr. Jacques when it terminated him.

82. Defendant's claim that it terminated Mr. Jacques due to his personal use of his work computer was a pretext for discrimination.

## COUNT III: ADA – Retaliation

83. Paragraphs 1-49 are incorporated by reference.

84. Defendant's conduct violates the ADA's prohibition against retaliation.

85. Mr. Jacques engaged in protected activity when he requested reasonable accommodations and when he complained about discrimination in connection with Mr. Glynn's refusal to require Mr. Joyce to do his fair share of the work in the freezers.

86. Defendant retaliated against Mr. Jacques because of his protected activity when it suspended him and terminated his employment.

87. Defendant's claim that it terminated Mr. Jacques due to his personal use of his work computer was a pretext for retaliation.

## COUNT IV: NHLAD – Retaliation

88. Paragraphs 1-54 are incorporated by reference.

89. Defendant's conduct violates the NHLAD's prohibition against retaliation.

90. Mr. Jacques engaged in protected activity when he requested reasonable accommodations and when he complained about discrimination in connection with Mr. Glynn's refusal to require Mr. Joyce to do his fair share of the work in the freezers.

91. Defendant retaliated against Mr. Jacques because of his protected activity when it suspended him and terminated his employment.

92. Defendant's claim that it terminated Mr. Jacques due to his personal use of his work computer was a pretext for retaliation.

## COUNT V: ADA – Failure to Accommodate

93. Paragraphs 1-59 are incorporated by reference.

94. Defendant failed to meet its obligation under the ADA to provide Mr. Jacques with reasonable accommodations.

## COUNT VI: NHLAD – Failure to Accommodate

95. Paragraphs 1-61 are incorporated by reference.

96. Defendant failed to meet its obligation under the NHLAD to provide Mr. Jacques with reasonable accommodations.

## COUNT VII: WRONGFUL DISCHARGE

97. Paragraphs 1-63 are incorporated by reference.

98. Defendant terminated Mr. Jacques for reasons that violate New Hampshire public policy.

99. Defendant is liable in tort under New Hampshire's common law claim for wrongful discharge in violation of public policy.

## PRAYER FOR RELIEF

Plaintiff respectfully requests that the Court grant the following relief:

A. Declare the conduct engaged in by Defendant to be in violation of his rights;

B. Enjoin Defendant, its agents, successors, employees, and those acting in concert with it from continuing to violate his rights;

C. Order Defendant to reinstate Plaintiff or award front pay to Plaintiff;

D. Award lost future earnings to compensate Plaintiff for the diminution in expected earnings caused by Defendant's discrimination;

E. Award equitable-relief for back pay, lost benefits, and prejudgment interest;

F. Award compensatory damages in an amount to be determined at trial;

G. Award punitive damages in an amount to be determined at trial;

H. Award enhanced compensatory damages in an amount to be determined at trial;

I. Award nominal damages;

J. Award attorney's fees, including legal expenses, and costs;

K. Award prejudgment interest;

L. Permanently enjoin Defendant from engaging in any employment practices which discriminate on the basis of disability;

M. Require Defendant's CEO to mail a letter to all employees notifying them of the verdict against them and stating that Defendant will not tolerate discrimination in the future;

N. Require that Defendant post a notice in all of its workplaces of the verdict and a copy of the Court's order for injunctive relief;

O. Require that Defendant train all management level employees on the protections afforded by the NHLAD and ADA;

P. Require that Defendant place a document in Plaintiff's personnel file which explains that Defendant failed to provide him with reasonable accommodations and unlawfully terminated him because of disability discrimination and retaliation; and

Q. Grant to Plaintiff such other and further relief as may be just and proper.

Respectfully submitted,

Dated: December 23, 2019

/s/ Allan K. Townsend

Allan K. Townsend
NH Bar No. 269356
Attorney for the Plaintiff

EMPLOYEE RIGHTS GROUP
92 Exchange Street 2nd floor
Portland, Maine 04101
Tel. (207) 874-0905
Fax (207) 874-0343
Allan@EmployeeRightsLaw.Attorney